**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

MARCELLUS JONES,

Plaintiff,

v.

WILLIAM CATTELL, *et al.*,

Defendants.

CIVIL ACTION NO. 1:23-cv-01991

(SAPORITO, J.)

# MEMORANDUM

Marcellus A. Jones, currently incarcerated at SCI-Dallas, proceeds against 20 defendants on a variety of federal and state law claims relating to his prior incarceration at SCI-Camp Hill. The defendants have moved for summary judgment. For the following reasons, we grant summary judgment as to all claims except Jones's claim of trespass to chattels against defendant U.M. Miller. Pursuant to 28 U.S.C. § 1367(c), we decline to exercise supplemental jurisdiction over this claim and dismiss it without prejudice.

## I. BACKGROUND

Jones's pending claims relate to a series of incidents of alleged abuse by SCI-Camp Hill staff, generally in retaliation for Jones filing

grievances and filing legal complaints. These incidents are summarized[1] as follows:

- On July 6, 2022, defendants Boose, Crozier, Nitchman, and several unnamed individuals allegedly confiscated Jones's typewriter.
- On August 6, 2022, defendants Alvord, Kuzar, Newsome, Comer, Gordon, and Hoffner "signed on" to move Jones into a cell that was allegedly infested with rodents and cockroaches, with no running water or air circulation, during a heat wave.
- On August 28, 2022, defendant Hoffner allegedly struck Jones with a handheld metal detector, while defendant Hosterman "stood by and made snide derogatory statements."
- On March 13, 2023, defendants Iagovino and Rodriguez allegedly took several e-cigarettes, tobacco pouches, and legal books from Jones's cell while he was being strip searched.
- In April 2023, defendant Dr. Cattell came to Jones's cell and allegedly "asked [Jones] if he wanted a 'hand job' or if he could

[1] The complaint is more fully summarized in the Court's January 29, 2025, memorandum addressing defendants' motion to dismiss. *See* (Doc. 26).

put a finger up Jones's ass." When Jones (who is diabetic) refused, Dr. Cattell allegedly said "you won't get any insulin then," and walked away.

- On May 26, 2023, after the typewriter allegedly confiscated from Jones in July 2022 was returned to him, defendants Miller, Mayers, Noss, Doyle, and Freed confiscated the typewriter again.
- On June 28, 2023, Jones was allegedly denied food items that he purchased from the prison commissary.

Following a motion to dismiss, Jones was permitted to proceed on the following claims:

- First Amendment retaliation claims against defendants Mayers, Flinchbaugh, Misiti, Iagovino, Rodriguez, Benner, Comer, Hoffner, and Newsome;
- Eighth Amendment conditions of confinement claims against Alvord, Kuzar, Newsome, Comer, Gordon, and Hoffner[2];

[2] Jones now argues that he asserted a separate claim premised on "a finding of conspiracy" relating to his conditions of confinement (Doc. 114 at 8-9), but it is unclear what claim he is referring to, and the Court did not make any such finding.

- An Eighth Amendment excessive force claim against Hoffner;
- An Eighth Amendment failure to intervene claim against Hosterman;
- An Eighth Amendment claim of denial of medical care against Dr. Cattell; and
- State law claims of conversion and trespass to chattels against defendants Boose, Crozier, Nitchman, Iagovino, Rodriguez, Miller, Mayers, Noss, Doyle, Freed, Misiti, Flinchbaugh, Newsome, Nicklow, Evans, and Benner.

The defendants have moved for summary judgment.[3] (Docs. 58, 61). Within his response brief (Doc. 114), Jones has also requested reconsideration of the Court's July 15, 2026, memorandum and order addressing his discovery motions.

## II. RECONSIDERATION

First, we address Jones's request for reconsideration of his discovery motions. *See* (Doc. 114 at 18-23). This request is evaluated

---

[3] One motion was filed by Dr. Cattell (Doc. 58), and a second motion was filed by the 19 "Commonwealth Defendants" (Doc. 61). For simplicity, we refer to the defendants collectively, although the arguments in their separate motions do not entirely overlap.

under Rule 54(b) of the Federal Rules of Civil Procedure. *See Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016). Under Rule 54(b), "[a]n order that does not dispose of every claim in an action 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Clark Distrib. Sys., Inc. v. ALG Direct, Inc.*, 12 F. Supp. 3d 702, 717 (M.D. Pa. 2014) (quoting Fed. R. Civ. P. 54(b)).

Reconsideration of interlocutory orders "may be had even if a movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issues the underlying order, or 'the need to correct a clear error of law or fact or to prevent manifest injustice.'" *Qazizadeh*, 214 F. Supp. 3d at 295 (quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). "Instead, the court may permit reconsideration whenever 'consonant with justice to do so.'" *Id.* (quoting *St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co.*, 412 F. Supp. 2d 630, 632 (M.D. Pa. 2007)). Nevertheless,

> [b]efore entertaining a motion for reconsideration of an interlocutory order, the movant must still establish good cause for why the court should revisit its prior decision. Moreover, whether involving a final or interlocutory

> order, a motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant. A reconsideration motion should not be used to try to get a second bite at the apple or to raise new arguments or evidence that could have been proffered prior to the issuance of the order in question.

*Qazizadeh*, 214 F. Supp. 3d at 295-96 (citations and internal quotation marks omitted).

First, Jones objects to the Court's conclusion that he did not try to resolve his specific objections with opposing counsel before filing his discovery motion. Although he points to letters he sent to opposing counsel, these letters contained only vague references to "discrepancies," "problems with access to evidence," and "confusion about evidence," and they predated defendants' most recent discovery responses.[4] Regardless, we addressed Jones's complaints about written discovery on their merits (Doc. 111 at 7-10), and he identifies no error in that analysis, so there is

[4] *See* (Doc. 83) (letters dated March 5 and 6, 2026); (Doc. 109 at 2, 4; Doc. 109-1 (discovery responses dated May 15)). The fact that Jones made multiple discovery requests did not negate the need to confer regarding defendants' objections. *See Bey v. Holt*, No. 1:23-CV-00328, 2026 WL 892497, at *6-7 (M.D. Pa. Mar. 31, 2026) (prior letters do not satisfy a plaintiff's obligation to confer regarding later disputes).

no basis for reconsideration.

Next, Jones objects to the Court's discussion of his spoliation claim. We determined that while Jones's requests to preserve video were apparently disregarded, he had not (yet) shown evidence of "bad faith" required for a finding of spoliation. We took this motion under advisement pending review of the summary judgment motions, with further proceedings to follow as warranted.[5] *See* (Doc. 111 at 1-5).

Jones now claims that opposing counsel's "bad faith conduct" justifies an immediate finding of spoliation, because (1) Jones and counsel "began to discuss [counsel] turning over evidence" at his deposition, but "no evidence/discovery was ever given to Jones"; and (2) defendants responded to his requests for video by stating in part that "no responsive materials were discovered."[6] (Doc. 114 at 22). Although Jones

[5] To the extent Jones claims his evidence of spoliation should itself preclude summary judgment, we address those arguments below as necessary.

[6] Jones's argument about this comment is difficult to follow. If it is true that the relevant video existed but was improperly lost, it would be accurate for counsel to say that they did not locate any responsive materials. Although Jones may be understandably frustrated at defendants' (or counsel's) failure to acknowledge evidence of his requests to preserve video, that does not itself demonstrate bad faith.

feels he is entitled to more discovery than he received, counsel's disagreement does not establish bad faith, so a spoliation determination remains unwarranted on this record. We will deny his motion for sanctions without prejudice to any relief he may seek in state court on his sole remaining claim.

## III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## IV. ADMINISTRATIVE REMEDIES

Prior to addressing the merits, we address defendants' arguments

that Jones failed to exhaust administrative remedies as to various claims. Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court. 42 U.S.C. § 1997e(a). The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). The Pennsylvania Department of Corrections ("DOC") provides a three-part procedure for inmate grievances: initial review by a Grievance Officer, appeal to the Facility Manager, and final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). Under the DOC's grievance policy, an inmate must submit a grievance within 15 working days after the event in dispute, and the Grievance Officer must respond within 15 working days. *See* DC-ADM 804, §§ 1(A)(8), 1(C)(5).

During the times when the incidents giving rise to Jones's claims could have been grieved, Jones filed 17 grievances, ten of which he

properly appealed to final review[7]:

- Grievance No. 989981, dated July 6, 2022, alleged that officers at SCI-Forest "[took Jones's] legal materials in order to deter [Jones] from filing complaints." (Doc. 79-13). None of the officers named in this grievance ("Hollis, Winger, Ferringer, Ellenberg & Siegworth[, led] by Perry") are defendants in this action.
- Grievance No. 989397, dated July 13, 2022, generally alleged that "COs Boose, Nitchman, & Crozier led by Lt. Walsh" were "withholding [Jones's] legal & personal property," including a typewriter. (Doc. 79-11).

---

[7] Jones disputes these facts, claiming that he "has filed and exhausted to completion all of the grievances related to this complaint." *See* (Doc. 117 at 11, ¶ 204). In support, he directs the Court to a set of grievance documents showing that appeals of three other grievances (Nos. 1028353, 1029719, and 1044537) were rejected as untimely filed. *See* (Doc. 119-3). This does not raise a genuine dispute relevant to exhaustion, because "an untimely 'or otherwise procedurally defective administrative grievance or appeal'" is not properly exhausted. *Porter v. Blake*, 289 F. App'x 560, 561 (3d Cir. 2008) (quoting *Woodford*, 548 U.S. at 83). Jones does not dispute the basis for the findings that the appeals were untimely, and the records he submitted are consistent with the prison's own records documenting those appeals. *See* (Doc. 79-10). He presents no evidence supporting his conclusory allegation that "all of the grievances" were exhausted.

- Grievance No. 989801, dated July 19, 2022, alleged that Jones "arrived at SCI-Camp Hill with six (6) boxes of property and a mesh laundry bag" and that "Boose Nitchman Crozier & Walsh [could] be seen on CCTV footage only issuing [Jones] two (2) boxes of property." (Doc. 79-12).
- Grievance No. 992454, dated August 5, 2022, alleged that "N-Block staff . . . under direct orders from [Captain] Kuzar came to the cell I was in and began to startle me from my sleep and threaten me because I was exercising my constitutional right to refuse medical treatment." He further alleged that "Patricia Comer [,] . . . Gorlely, Newsome, and Benner authorized" the sleep deprivation "for retaliatory and malicious reasons." (Doc. 79-14). There is no claim in this relating to sleep deprivation.
- Grievance No. 992473, dated August 5, 2022, alleged that Comer "placed [Jones] in an 'observation cell' under extremely torturous confinement conditions." Comer allegedly said she was doing so "vindictively" because Jones was a jailhouse lawyer and "refused medical treatment." (Doc. 79-16).

- Grievance No. 992462, dated August 6, 2022, alleged that Jones was "held in a torture cell . . . for [24] hours" on August 6, "by SCI-Camp Hill medical staff: 'Voorstad,' 'Kuzar.' 'Gordon,' 'Bonetti(?)' and 'Comer'." (Doc. 79-15).
- Grievance No. 995506, dated August 25, 2022, alleged that "Scibelli," a law librarian, issued Jones "blank pages" instead of unspecified "copies" that Jones had paid for. (Doc. 79-17). This grievance has no apparent connection to this case.
- Grievance No. 1036540, dated June 2, 2023, alleged that on May 27, 2023, Jones was "suffering from the effects of too high blood sugar and nearly rendered comatose." Despite a "glucometer reading of 1500," the "[SCI-Camp Hill] medical department [led] by 'Beck' and 'Shayk' . . . refused to have [Jones] hospitalized." (Doc. 79-18). There is no claim relating to this incident in this case.
- Grievance No. 1036913, dated June 2, 2023, alleged that on May 26, 2023, "K-Block's staff," including "Miller Doyle Noss Meyers[?] . . . and others," took Jones's "legal and personal

property hostage in order to sabotage [his] ongoing civil cases." (Doc. 79-19).

- Grievance No. 1038849 related to the allegation[8] that Jones "requested a legal property exemption [and was] refused" permission to have "more than 1 legal box" by "Superintendent Gourely and his assistant, Ms. Heist." (Doc. 79-20). There is no claim in this case relating to a denial of a "legal property exemption."

From the above facts, it is apparent that Jones did not exhaust administrative remedies with respect to the alleged March 2023 seizure of property during a strip search; the April 2023 incident in which he was allegedly denied insulin after enduring sexually abusive remarks[9]; the

[8] Jones's initial grievance is not among the documents produced; however, his appeals confirm that this was the subject of this grievance. *See* (Doc. 79-20 at 4, 6).

[9] While Jones argues that the DOC's grievance rules "prohibit grievance filings based on sexual abuses," *see* (Doc. 116, ¶ 4), that does not excuse exhaustion because Jones presents no evidence that he tried to use the DOC's separate process for such complaints. *See* DC-ADM 008; *Camacho v. Dean*, No. 1:14-CV-01428, 2018 WL 2225177, at *9-11 (M.D. Pa. Apr. 9, 2018). Regardless, it is undisputed that Jones has not exhausted any grievance regarding his lack of access to insulin, which is the claim at issue in this case.

June 2023 incident involving foods from the commissary; and most of his retaliation claims. However, Jones has exhausted remedies with respect to the alleged seizures of his typewriter in July 2022 and May 2023; his placement in what he calls the "torture cell"; his allegation that defendant Comer[10] placed him in the torture cell to dissuade him from filing grievances and complaints; and his claim that defendant Mayers[11] seized his typewriter in May 2023 to dissuade him from filing motions.

Further, Jones attests that he filed an unspecified "grievance against" Hoffner and Hosterman on September 13, 2026, regarding the August 2022 metal detector incident, and never received a response. (Doc. 117-1, ¶ 3). "[A]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable," and

---

[10] The grievances concerning the August 2022 seizure of the typewriter did not contain allegations of retaliatory intent, *see* (Doc. 79-11 at 6, Doc. 79-12 at 8); therefore, any claims of retaliation based on that incident are unexhausted.

[11] Although the June 2023 typewriter grievance listed other defendants who allegedly participated in the seizure with retaliatory intent, Jones's complaint in this case did not state plausible retaliation claims against them. *See* (Doc. 26 at 17) (discussing defendants Noss, Doyle, Freed, and Miller).

the exhaustion requirement is satisfied. *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019). Jones does not otherwise attest to the content of the September 13 grievance, but we will address the Eighth Amendment claims against Hoffner and Hosterman on their merits.

Based on these findings, the following claims survive: First Amendment retaliation claims against Comer and Mayers; Eighth Amendment claims against Hoffner and Hosterman regarding the metal detector incident; Eighth Amendment claims against Alvord, Kuzar, Newsome, Comer, Gordon, and Hoffner regarding the "torture cell"; and state law claims of conversion and trespass to chattels against Boose, Crozier, Nitchman, Nicklow, Benner, Miller, Mayers, Noss, Doyle, and Freed.[12]

---

[12] With respect to the property claims regarding Jones's typewriter, and the Eighth Amendment claims regarding the "torture cell," Jones may proceed against all corresponding defendants even though they were not all named in his grievances. *See Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (the grievance must "alert prison officials to [the] problem," but need not "provide personal notice to a particular official that he may be sued") (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)). However, his retaliation claims can only proceed against a defendant where he specifically alleged their retaliatory motive in the appropriate grievance. Jones's grievances alleging retaliation by specific individuals would not place prison officials on notice of a claim that other, unspecified officials were acting for the same reasons. *See, e.g.*, *Beale v. Lamas*, No. 2:20-CV-

*(continued on next page)*

## V. Material Facts

### A. Jones's Evidentiary Submissions

Jones's responses to defendants' statements of material facts refer only sparingly to evidence. *See* (Docs. 116, 117); M.D. Pa. L.R. 56.1. Nonetheless, we have considered all the evidence and argument the parties have submitted.[13] *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Where Jones has not presented competent evidence to dispute defendants' fact statements, those facts are deemed undisputed. *See* Fed. R. Civ. P. 56(e)(2).

Jones has filed an addendum to his summary judgment briefing in which he requests that the Court take "judicial notice" of various documents he filed in another case in this district, along with unspecified "orders, judgments, pleadings and other official records." *See* (Doc. 118).

---

05137-JMG, 2026 WL 2491775, at *8-9 (E.D. Pa. Aug. 24, 2026) ("To exhaust a retaliation claim against Lt. Arias, Beale was required to submit a grievance identifying retaliatory conduct by Lt. Arias.").

[13] Jones has untimely submitted evidence in a piecemeal fashion, alleging that unspecified mailings were delayed or intercepted by the prison mail system. Regardless, we have considered his response briefs, statements of facts, and all attached evidence. *See* (Docs. 113-117, 119).

We infer that Jones wants the content of these documents to be considered as evidence in opposition to summary judgment. However, Jones's own statements of facts do not refer to these documents, and he does not explain what facts they are intended to establish or dispute. We are not obliged to scour documents outside the record of this case to search for unspecified disputes of fact. *See* Fed. R. Civ. P. 56(c)(1). Further, a fact is not subject to judicial notice merely because it was asserted in another proceeding. *See* Fed. R. Evid. 201(b)(2); *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("Taking judicial notice of the truth of the contents of a filing from a related action could reach, and perhaps breach, the boundaries of proper judicial notice."). Jones claims judicial notice would be justified because he has not received other discovery he requested, but that is irrelevant; he had access to the prior filings in the other case, so the discovery disputes did not impede him from presenting them in this case. Therefore, Jones's request will be denied, and we review the material facts based on the evidence presented in this case.

**B. July 6, 2022, Typewriter Seizure**

In his complaint[14], Jones alleges that on July 6, 2022, defendants Boose, Crozier, and Nitchman confiscated Jones's typewriter, and that in August 2022, defendants Benner and Nicklow made comments indicating that they had the ability to return his typewriter and refused to do so.

Defendants' statement of facts does not address these claims except to say that Jones "cannot produce competent admissible evidence" to support them. *See* (Doc. 79, ¶¶ 59-62, 124-31). Jones responds that "Boose's actions on July 6, 2022, make[ ] him liable for the property Jones never saw again after Boose restricted it from Jones" (Doc. 117 at 3), but the grievance records he cites do not support these facts. *See* (Doc. 119-3).

Documents attached to Jones's grievance paperwork indicates that the typewriter was seized when he was transferred from SCI-Forest to SCI-Camp Hill on July 6, 2022. A property inventory form indicates that the typewriter was returned to Jones on July 12. In the area of the form

[14] We do not consider Jones's complaint as evidence, because while it concludes with what Jones describes as a "verification," it is not sworn under penalty of perjury. *See* (Doc. 13 at 12); 28 U.S.C. § 1746; *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019).

for the inmate to certify that no property referenced on the form was "missing and/or damaged," a signature is legible. *See* (Doc. 79-11 at 8-9; Doc. 79-12 at 7).

**C. August 5-6, 2022, Infirmary Visit**

Jones alleges that on August 6, 2022, defendants Alvord, Kuzar, Newsome, Comer, Gordon, and Hoffner "signed on" to move Jones into a cell with no running water or air circulation during an "extremely oppressive heat wave."

Jones's medical records indicate that on the morning of August 5, 2022, Jones, who is diabetic, refused glucose checks and insulin. Upon review of Jones's "numbers since [July] 31," the medical staff found that he was at risk for hyperglycemia. (Doc. 79-8). He was involuntarily admitted to the infirmary at 12:18 p.m. "for non compliance and risk of worsening medical condition." *See* (Docs. 79-1, 79-2). A note written by defendant Comer reads: "While [Jones] does have the right to refuse his treatment, he does not have the right to refuse a housing change and infirmary placement[.] He is in need of further observation to ensure that he does not have a bad outcome given his poor decision to refuse insulin and [blood sugar] checks." (Doc. 79-8).

At 11:30 p.m. in the infirmary, Jones summoned a nurse for a complaint that his "water faucet [was] broke." The nurse noted that Jones was "able to obtain water but [it was] coming out nonstop." (Doc. 79-3). The following morning, Jones was "feeling well but complain[ed] that the cell was too hot." He was examined, had vital signs taken, and was noted to be in "no general discomfort." *See* (Doc. 79-4). He was discharged to the general population at 11:26 a.m., after approximately 24 hours in the infirmary. (Doc. 79-1).

Jones contends that prison staff conspired to place him in the infirmary so that he would miss a video court hearing. He attaches declarations of inmates attesting that on August 3, they overheard prison staff say that they were planning on putting him in a "hard cell" in the infirmary. Inmate Kamil Brown, who attests that he was in the "medical area" with Jones on August 5, attests that multiple staff talked about Jones being exposed to "roaches" or "rats" in the hard cell. Brown attests that Comer said: "[W]e've all agreed to have you put in a hard cell and shift commander Kuzar already told us to let you suffer in there without any water or A/C." *See* (Doc. 117-3).

**D. August 28, 2022, Metal Detector Incident**

Jones alleges that on August 28, 2022, defendant Hoffner struck him with a handheld metal detector, while defendant Hosterman "stood by and made snide derogatory statements encouraging Hoffner's attack."

Jones presents the affidavit of another inmate, Demetrius Bailey, who attests that on or about August 28,

> I saw Jones and a bunch of other people going to the medical area to get insulin, when [CO] Hoffner stopped Jones and then began to hit him with a hand held metal detector . . . Hosterman told Hoffner that's good and you should get him again so he'll know not to file any more lawsuits against you.

(Doc. 117-4). Defendants do not address these claims in their statement of facts except to say that Jones "cannot produce competent admissible evidence" to support them. (Doc. 79, ¶¶ 54-58, 63-68).

**E. May 26, 2023, Typewriter Seizure**

Jones alleges that on May 26, 2023, defendants Miller, Mayers, Noss, Doyle, and Freed confiscated his typewriter for an unspecified time.

Defendants contend that on the date in question, Jones did not have a typewriter. They present property inventory forms dated March 18, 2023, and May 26, 2023, which do not list a typewriter among Jones's

belongings. *See* (Docs. 79-5, 79-6).[15] However, a "Confiscated Items Receipt" indicates that a typewriter was seized from Jones on May 26 at 2:00 pm. (Doc. 79-19 at 11).

In response to Jones's grievance, a prison official wrote that the "typewriter was confiscated as you failed to provide documentation stating that it was your typewriter along with any documentation that it was obtained through litigation." (*Id.* at 7). When Jones argued on appeal that he was not given the opportunity to provide documentation, the facility manager responded that Jones was "unable to be present" at the time of the seizure "due to [his] placement in the Infirmary or the RHU." It was conceded that Jones had not been "appropriately issued" the confiscated items receipt. (*Id.* at 9). In his final grievance appeal, Jones submitted a document that appears to be a portion of a settlement

[15] Defendants do not identify any other facts regarding these claims, beyond asserting that Jones "cannot produce competent admissible evidence" to support them. *See* (Doc. 79, ¶¶ 146-172). In response, Jones makes a series of allegations without citation to evidence, which are disregarded. *See* (Doc. 117, ¶¶ 146-172). Jones has also submitted a "Declaration/Affidavit" of another inmate that addresses Jones's typewriter access in May 2023; however, this document is unsigned and therefore disregarded. *See* (Doc. 117-7); 28 U.S.C. § 1746; *Davis v. Solid Waste Servs., Inc.*, 20 F. Supp. 3d 519, 529-30 (E.D. Pa. 2014).

agreement resolving two federal cases filed by Jones in 2019. *See* (*Id.* at 13-16). Among the terms is that Jones "will receive a typewriter, which will become part of his personal property." (*Id.* at 16). SOIGA's October 10, 2023, response confirmed that "UM Miller was still holding the typewriter," and that because Jones had since been transferred to a different prison, he would not receive it until he paid for it to be shipped to him.[16] (*Id.* at 2).

## VI. DISCUSSION

Jones proceeds on Eighth Amendment conditions of confinement claims, Eighth Amendment excessive force and failure to intervene claims, state law property claims, and First Amendment retaliation claims, and we review the claims in that order.

### A. Conditions of Confinement

The Eighth Amendment "prohibits any punishment which violates civilized standards and concepts of humanity and decency," including

[16] To the extent any of the statements in Jones's grievance responses would be inadmissible for the truth of the matter asserted, *see Travillion v. Wetzel*, No. 24-1763, 2025 WL 971669, at *2 (3d Cir. Apr. 1, 2025), they are nonetheless admissible to show that Jones's typewriter was seized and had not been returned to him when prison officials responded to his grievance and appeals.

conditions that deprive prisoners of "the minimal civilized measure of life's necessities." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). The "benchmark" for unconstitutional conditions of confinement "is not that the inmate was merely uncomfortable; he or she must show they are 'incarcerated under conditions posing a substantial risk of serious harm.'" *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2023). In addition, the prisoner must show that the prison official acted with deliberate indifference to the prisoner's health or safety. *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

The record could support an inference that Jones was placed in a cell without air conditioning, with a dysfunctional faucet, and with some presence of rats and/or cockroaches, for approximately 24 hours. Although unpleasant, exposure to such conditions for a brief period would not establish an Eighth Amendment violation. The vague references to "roaches" and "rats" in the cell do not suggest a substantial risk of serious harm.[17] Given that Jones was under continual evaluation, *see* (Docs. 79-

[17] *See, e.g.*, *Davis v. Pennsylvania Dep't of Corr.*, No. 1:16-CV-00515, 2019 WL 6338015, at *8 (M.D. Pa. Nov. 6, 2019) (inmate held for 30 days

*(continued on next page)*

3, 79-4), there can be no reasonable inference of a substantial risk of harm from a lack of air conditioning or "running water"[18] for 24 hours. *See*, *e.g.*, *McCary v. Terra*, No. 25-CV-0625, 2025 WL 1256401, at *5-6 (E.D. Pa. Apr. 30, 2025) (lack of access to air conditioning for intermittent periods of three to five days was not an Eighth Amendment violation) (listing cases); *Dantzler v. Russell*, No. 23-CV-4769, 2024 WL 1120381, at *3 (E.D. Pa. Mar. 14, 2024) (allegations that the water in a cell was "shut off," or that there was no "running water," did not sustain an Eighth Amendment claim absent facts showing that the plaintiff was actually denied water).

---

in cell with mouse droppings); *Rodriguez v. Thomas*, 299 F. Supp. 3d 618, 637-38 (M.D. Pa. 2018) (inmate relied on a "blanket statement" that his cell was "infested with cockroaches and mice"; "[a]lthough [the inmate] presumably suffered discomfort by virtue of the presence of cockroaches and mice, he has not shown that he faces a 'substantial risk of serious harm' that has been disregarded by prison officials"); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 467 (M.D. Pa. 2010) (plaintiff alleged inadequate plumbing and ventilation, and infestation with "cockroaches, spiders, worms, gnats, mice and other unknown insects," but failed to allege that "any of the conditions in his cell jeopardized, or potentially jeopardized, his health, or caused the cell to be unfit for habitation").

[18] Although prison staff are quoted as saying that the infirmary cell would have "no water," the record demonstrates that Jones was provided water while he was in the cell. *See* (Doc. 79-3) (despite malfunctioning faucet, Jones was "able to obtain water" and was provided a cup); (Doc. 79-4 at 4) ("appetite and fluid intakes [were] adequate," with "no complaints" from Jones).

**B. Excessive Force/Failure to Intervene**

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). An excessive force claim has objective and subjective components: the force must be "sufficiently serious," and the plaintiff must show that the force was applied "maliciously and sadistically to cause harm" rather than in "a good-faith effort to maintain or restore discipline." *Smith v. Mensinger*, 293 F.3d 641, 648-49 (3d Cir. 2002) (quoting *Hudson*, 503 U.S. at 9-10). Ultimately, the Eighth Amendment does not prohibit *de minimis* applications of force; every "malevolent touch by a prison guard" does not create a federal cause of action. *Hudson*, 503 U.S. at 9. Therefore, while a lack of injury is not dispositive, "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (quoting *Hudson*, 503 U.S. at 8).

Jones has presented evidence of a "malevolent touch," *i.e.*, that Hoffner struck him with a metal detector for no apparent purpose.

However, he has not offered evidence that he was injured[19], nor other evidence (or even allegations[20]) supporting a reasonable inference that the force was anything greater than *de minimis*. At the summary judgment stage, that is fatal to his claim. *See Wyatt v. Malisko*, No. 3:16-CV-01438, 2020 WL 3001936, at *9 (M.D. Pa. Mar. 19, 2020) (listing cases); *Taylor v. Sanders*, No. 1:11-CV-1291, 2012 WL 4104871, at *7 (M.D. Pa. Sept. 18, 2012) (inmate's bare claim that an officer pushed or punched him without provocation was insufficient). Hosterman is entitled to summary judgment on the attendant claim of failure to intervene. *See Smith*, 293 F.3d at 650-52 (a failure to intervene requires an underlying constitutional violation).

We have considered Jones's argument that defendants' apparent failure to preserve video of this incident should preclude summary judgment. However, he offers no basis to infer that the video (or any other

---

[19] Jones has generally alleged that "high levels of abuse" at SCI-Camp Hill "ignited . . . psychosis" and caused other mental health issues, "vision problems, appetite loss and migraines." (Doc. 13, ¶ 54). He presents no evidence of such injury, nor any other injury from the metal detector incident specifically.

[20] Jones repeatedly describes the "attack" in vague, general terms; he does not appear to allege anything more than the bare fact that Hoffner "hit" or "struck" him. *See*, *e.g.*, (Doc. 13 at 8, Doc. 114 at 3, 7-8).

discovery) would provide evidence that Hoffner used greater than *de minimis* force. Moreover, any finding of spoliation would be unlikely given that Jones claims to have never received a response to the corresponding grievance (and therefore, has no apparent basis to conclude that anyone deliberately ignored an alleged demand in the grievance to preserve video).

**C. Property Claims**

"The law of Pennsylvania recognizes two torts involving the intentional touching, use, and damaging of another's personal property: trespass to chattels and conversion." *Carmen Enters., Inc. v. Goldin*, 2026 PA Super 117, 2026 WL 1659716, at *25 (June 9, 2026). Generally, conversion refers to "the deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995). "In order for there to be a conversion, the deprivation must be complete – namely, the theft or total destruction of the good." *Carmen Enters*, 2026 WL 1659716, at *26. Because the record indicates that Jones was not permanently deprived of his typewriter, there is no viable

claim of conversion, and defendants are entitled to summary judgment on these claims.

The tort of trespass to chattels involves "intentionally dispossessing another of the chattel, or using or intermeddling with a chattel in the possession of another." *Pestco, Inc. v. Associated Prods., Inc.*, 880 A.2d 700, 708 (Pa. 2005) (citations omitted). Trespass to chattels may apply when the interference with the property is minor or temporary, "thereby allowing for damages less than the full market value of the chattel in question." *Deitrick v. Costa*, No. 4:06-CV-01556, 2015 WL 1606641, at *16 (M.D. Pa. Apr. 9, 2015). To recover such damages, the plaintiff must still establish that he suffered harm from the temporary interference. *See Carmen Enters.*, 2026 WL 1659716, at *26 ("Nominal damages will not be awarded, and . . . in the absence of any actual damage the action will not lie.") (citation omitted).

Defendants renew their argument that they are entitled to sovereign immunity from these claims. Pennsylvania generally immunizes state employees from tort liability; however, Pennsylvania law recognizes an exception to sovereign immunity for certain claims for "damages arising out of a negligent act" caused by "[t]he care, custody or

control of personal property in the possession or control of Commonwealth parties." *See* 42 Pa. Con. Stat. Ann § 8522(a), (b)(3)).

Defendants argue that because conversion and trespass to chattel "arise[ ] from an intentional act," these claims cannot fall under an exception to sovereign immunity premised on a "negligent act." Although these are recognized as intentional torts, case law does not clearly resolve to the extent to which these claims can be premised on negligence.[21] We note that in several unpublished decisions, the Third Circuit has indicated that Pennsylvania prisoners can pursue conversion claims premised on apparently intentional deprivations of property.[22] Further,

---

[21] *See*, *e.g.*, *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 (Pa. Super. Ct. 2000) ("Although the exercise of control over the chattel must be intentional, the tort of conversion does not rest on proof of specific intent to commit a wrong.") (citing *Norriton East Realty Corp. v. Central–Penn National Bank*, 254 A.2d 637 (Pa. 1969)); *Burton v. Pennsylvania Dep't of Corr.*, 250 A.3d 547, 2021 WL 439435, at *6 n.6 (Pa. Commw. Ct. 2021) (listing case law); *Borrero-Bejerano v. Dep't of Corr.*, No. 453 C.D. 2018, 2019 WL 489835, at *5 (Pa. Commw. Ct. Feb. 8, 2019) (discussing the concept of "negligent conversion").

[22] *See*, *e.g.*, *Cruz v. SCI-SMR Dietary Servs.*, 566 F. App'x 158, 160 (3d Cir. 2014); *Dockery v. Beard*, 509 F. App'x 107, 113-14 (3d Cir. 2013); *Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005); *see also Harris v. Wetzel*, 822 F. App'x 128, 131 (3d Cir. 2020) (state law claims of "deprivation of lawful property & loss of use" and "theft of property").

the record does not clearly indicate whether the conduct at issue here was negligent or intentional; to the extent the *pro se* plaintiff's "conversion" claims were essentially mislabeled because the conduct at issue sounded in negligence, dismissal would not be appropriate on that basis.[23] Therefore, we consider these claims on their merits.

With regard to the July 2022 seizure, the record forecloses a claim of trespass to chattels. Jones argues that the typewriter was seized with an improper or retaliatory motive, but the evidence indicates that it was returned on July 12, and there is no indication that it was damaged or that Jones suffered harm from this brief deprivation. *See*, *e.g.*, *Dickerson v. DeSimone, Inc.*, No. 1581 EDA 2015, 2016 WL 5921721, at *3 (Pa. Super. Ct. Sept. 7, 2016) (plaintiff failed to prove damages from dispossession of a car for 10 days).

As to the May 2023 seizure, however, the limited record precludes summary judgment against defendant Miller. Defendants' theory that Jones did not have a typewriter on the date in question is contradicted

---

[23] Jones's complaint repeatedly refers to unspecified "intentional and conversion torts." From this statement, and his factual allegations, we construed the complaint as asserting claims of conversion and trespass to chattels. *See* (Doc. 26 at 18-20).

by the evidence that it was seized from him on that date. The settlement agreement indicating that Jones would "receive a typewriter, which will become part of his personal property," and the grievance appeal responses acknowledging this agreement, would permit a reasonable jury to infer that Jones was entitled to have the typewriter.

The record indicates that Jones was deprived of the typewriter from May 26 through at least October 10, and a jury could infer that Jones was harmed by the lack of access to his typewriter for this length of time. *See Dickerson*, 2016 WL 5921721, at *3 n.2 ("depriv[ation] of the use of the chattel for a substantial time" can sustain a claim) (citing Restatement (Second) of Torts §§ 217, 218). Further, Jones suffered damages to the extent he had to pay for the typewriter to be shipped back to him. Although Jones listed a variety of defendants for this claim, the record substantiates the involvement of only one defendant: Miller, the officer who signed the initial confiscation receipt and who was apparently still in possession of the typewriter as of October 10. Therefore, we deny summary judgment to Miller on the trespass to chattels claim against him, but we grant summary judgment to all other defendants on Jones's property claims.

**D. Retaliation**

Jones proceeds on two retaliation claims; one against Mayers relating to the May 2023 seizure of his typewriter, and one against Comer relating to his placement in the infirmary. To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

Defendants are entitled to summary judgment on both claims. Jones cannot sustain a retaliation claim against Mayers, because he has not presented any evidence showing that Mayers was personally involved in the seizure of the typewriter, nor that Mayers took any other adverse action against him. *See also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs.").

As for the retaliation claim against Comer regarding his placement in the infirmary, Jones's evidence does not support a reasonable inference that this was an "adverse action" sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. The effect of an "adverse" action must be more than *de minimis*; cell transfers that cause temporary or minor inconveniences do not meet this standard.[24] Our review indicates that when courts have recognized cell transfers as potentially adverse actions, they involved conditions that were more severe or imposed for longer periods than what is described here.[25]

---

[24] *See*, *e.g.*, *Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) ("Owens' mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet these elements."); *Verbanik v. Harlow*, 512 F. App'x 120, 122 (3d Cir. 2013) (placement in a "less desirous cell" was insufficient); *Griffin v. Malisko*, No. 1:18-CV-01155, 2018 WL 5437743, at *2-3 (M.D. Pa. Oct. 29, 2018) (transfer to a cell with "brown water and no hot water"); *Dillard v. Talamantes*, No. 1:15-CV-974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018).

[25] *See*, *e.g.*, *Martin v. Gearhart*, 712 F. App'x 179, 188 (3d Cir. 2017) (inmate denied any potable water for more than a day in a cell that smelled of urine and feces, causing him to become sick); *Kapellusch v. Schnell*, No. 1:23-CV-00226-SPB-RAL, 2024 WL 5319116, at *1-2, 7 (W.D. Pa. Dec. 5, 2024) ("lack of water, leaking sewage, and a non-functioning toilet" lasting more than two weeks); *Molina v. Rivello*, No. 3:23-CV-01111, 2023 WL 8359951, at *1, 4 (M.D. Pa. Dec. 1, 2023) (inference of retaliation premised on a series of transfers to different cells over time); *Newmones v. Ransom*, No. 1:21-CV-00276-RAL, 2022 WL 4536296, at *5

*(continued on next page)*

Although unpleasant, the evidence of Jones's 24-hour placement in a warm cell with poor air circulation and plumbing, and an unspecified presence of rats and cockroaches, does not reasonably suggest an adverse action sufficient to support a constitutional claim, especially given that he was under medical observation and suffered no apparent injury. Accordingly, Comer is entitled to summary judgment on this claim.

## VII. SUPPLEMENTAL JURISDICTION

Summary judgment will be granted as to all claims except for Jones's claim of trespass to chattels against defendant Miller. Because no federal claims remain, we decline to exercise supplemental jurisdiction over this state tort claim. When a federal court dismisses all federal claims prior to trial, it "must decline" to exercise jurisdiction over state law claims "unless considerations of judicial economy, convenience, and fairness to the parties" dictate otherwise. *See* 28 U.S.C. § 1367(c); *Talley v. Clark*, 111 F.4th 255, 266 n.6 (3d Cir. 2024) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)); *Yue Yu v. McGrath*, 597 Fed. Appx, 62,

---

(W.D. Pa. Sept. 28, 2022) (placement in restricted housing and deprivation of meals for two days were adverse actions, but the deprivation of "cleaning supplies, recreation and showers" over the same period was insufficient).

68 (3d Cir. 2014) (district court declined to exercise supplemental jurisdiction after granting summary judgment on all federal claims).

Although this case has been pending for some time, the parties have developed only a limited record as to the sole remaining claim, so it is not clear that judicial economy, convenience, or fairness require that the claim be resolved in this court. Further, the uncertainty as to the legal standards applicable to this claim favors resolution in state court.[26] *See De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 311 (3d Cir. 2003). We therefore decline to exercise supplemental jurisdiction.

## VIII. CONCLUSION

For the foregoing reasons, we will dismiss Jones's state law claim without prejudice, grant summary judgment to the defendants on all other claims, and deny any further relief requested in Jones's filings. An appropriate order follows.

Dated: September 25, 2026

*s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States District Judge

[26] The statute of limitations will not prevent Jones from asserting his claim in state court. *See* 28 U.S.C. § 1367(d) (when a state law claim is asserted in federal court based on the court's supplemental jurisdiction, the period of limitations "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed"); *Hedges*, 204 F.3d at 123-24.